UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                               Criminal No. 07-20068

v.

                               Hon. Linda V. Parker

Jorge Viramontes,

      Defendant.

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

Defendant, Jorge Viramontes, seeks compassionate release under 18 U.S.C.

§ 3582(c)(1)(A)(i). Given that he declined a vaccination against COVID-19, and

for a variety of other reasons, his motion should be denied.

### I. Background

### A. Criminal Conduct

Jorge Viramontes was a key player in a 2007 multi-kilogram cocaine

conspiracy working in the Flint, Michigan area. PSR, ¶¶ 11-17. With the benefit of

a wiretap, law enforcement determined that drugs and money were being stored

and distributed from the residence of Viramontes. During surveillance on February

9-10, 2007, officers observed traffic back and forth to the residence, including the

arrival of his co-defendant, Deshawn Howard. On February 10, 2007, officers saw

a male and female enter the house, taking a duffle bag from a vehicle into the home. Later that same day, Howard returned to the house carrying something. One hour later, Howard left the residence again carrying something. During a law enforcement chase of Howard, he threw five bricks of cocaine out the window. After he was taken into custody, law enforcement found four more bricks of cocaine in his car.

Officers then executed a search warrant at the residence of Viramontes. "Located there were Jorge Viramontes and his family." PSR, ¶ 14.[1]  Officers found $619,230.00 in cash wrapped in gray duct-taped material, packaging material, an automatic bill counter, and correspondence addressed to Viramontes at that location. At Howard's residence, officers found $25,602.00 in cash, heroin, cocaine, a loaded .357 revolver, packaging material, and drug ledgers.

Further investigation revealed that Viramontes was periodically sent to Flint to count the drug money prior to being sent to California. Based on the seized cocaine, and a calculation using the money seized, the cost of a kilogram of cocaine at the time, and the number of trips Viramontes made to Flint, Viramontes was ultimately held liable for 50-150 kilograms of cocaine.

---

[1] While the "Offense Conduct" section of presentence report does not indicate the names of the family members that were present, it does indicate, in another section, that Viramontes had a wife and three kids, Jorge Jr., 21, Vanessa, 18, and Ashley, 14. PSR, ¶ 52.

On February 14, 2007, both Howard and Viramontes were indicted on two cocaine charges. ECF No. 7, PgID.10. On April 3, 2007, the government filed a Penalty Enhancement Information against both defendants, providing notice that the defendants faced life imprisonment due to prior drug convictions. ECF No. 19, PgID.67 (Viramontes); ECF No.18, PgID.65 (Howard).

On June 12, 2007, Viramontes pleaded guilty before Judge Gadola to conspiracy to possess with intent to distribute five kilograms or more of cocaine. ECF No. 20, PgID.69 (plea agreement). The plea agreement set a twenty-year floor on his sentence, agreed that Viramontes was a career offender, and agreed to a guideline range of 262-327 months. *Id.* at 73. The plea agreement also included a cooperation provision, where Viramontes agreed to provide truthful information and testimony; in exchange, the government agreed to "withdraw the Section 851 penalty enhancement information that notices defendant's two prior drug felony trafficking convictions and re-file the penalty enhancement information noticing only one of the defendant's prior felony drug trafficking convictions. This action will reduce the defendant's mandatory minimum sentence from life imprisonment to a mandatory minimum of 240 months." *Id.* at 70-72. On June 12, 2007, consistent with the plea agreement, the government filed an Amended Penalty Enhancement Information, honoring the agreed-upon commitment, presumably due to cooperation provided by Viramontes. ECF No. 21, PgID.88.

On February 25, 2008, Judge Gadola sentenced Viramontes to 327 months in prison, the top of his agreed upon guideline range. ECF No. 29, PgID.102.

At the time, he had a lengthy criminal history involving four prior drug convictions and a carrying a concealed weapon conviction. He committed these offenses between the ages of 25-42 (his age at the time of the instant drug offense) and in three separate states (California, Arizona, and Michigan). PSR, ¶¶ 32-49. His drug offenses involved a wide variety of drugs – methamphetamine, amphetamine, marijuana, cocaine, and cocaine base. His "supervision end date" for his 1995 drug conviction was January 28, 2004. *Id*. at ¶ 37. Two months later, he was back to drug dealing, again arrested on a drug case. *Id*. at ¶ 43. He committed the instant federal offense while on probation and his criminal history reflects he did the same in the past. *Id*. at ¶¶ 35-37.

At the time of his 2007 sentence, Viramontes had a Body Mass Index (BMI) of 31 (based upon a height of 5 feet 6 inches and a weight of 195 pounds as reflected in his presentence report) and he had "a history of asthma, but does not have his inhaler in the jail and has not needed it." PSR, ¶ 53.

The defendant is serving his sentence at Federal Correctional Institution Mendota (hereafter Mendota), with an anticipated release date of June 2, 2030. Exhibit One (Public Information, Inmate Data, Viramontes). As of April 21, 2021, he has served approximately 170 months of his 327-month sentence. BOP records

4

reflect two disciplinary incidents, committing a prohibited act in 2009, and possessing an unauthorized item in 2013. Exhibit Two (Inmate Discipline Data). He has taken several educational classes. Exhibit Three (Inmate Education Data). BOP has designated Viramontes as a "Low Risk Recidivism Level." Exhibit Four (Inmate History, First Step). He appears to have a pending probation violation warrant out of California and he may have an Immigrations and Customs Enforcement detainer as "investigation into deportation" was pending as of his Individual Needs Plan – Program Review on November 6, 2020. Exhibit Five (Individual Needs Plan – Program Review).

**B.    Request for Compassionate Release**

On August 10, 2020, the defendant submitted a request for compassionate release to the warden. Exhibit Six (Inmate Request to Staff). The request was based on "chronic medical issues, which are severe asthma, high-blood pressure, heart condition, and obesity", as well as the risk presented should the defendant contract COVID-19. On August 26, 2020, the warden denied this request. Exhibit Seven (Response to Inmate Request to Staff). On April 18, 2021, the defendant, through retained counsel, submitted a motion to this Court for compassionate release. Thus, the government agrees that more than 30 days have passed since the defendant's request to the warden, and that he therefore has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

5

The government obtained the defendant's 2019-2021 medical records from BOP, which are filed under seal as Exhibits Eight (2021 medical records), Nine (2020 medical records), and Ten (2019 medical records). The records reveal that the defendant, who is 54 years old, presents obesity (BMI varying between 31-36), asthma, and hypertension. The asthma and hypertension appear well-controlled at this time with medication provided by the institution. The defendant is fully ambulatory and engages in all normal activities of daily living (ADLs). On April 7, 2021, the defendant was offered the Moderna COVID-19 vaccine, and he refused it. Exhibit Eight (2021 medical records, p. 38).

### C.    BOP's Response to the COVID-19 Pandemic

As the Court is aware, from the moment the pandemic began, the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

As it relates to the defendant, BOP's aggressive efforts have extended to Mendota. That institution houses 893 inmates. See https://www.bop.gov/locations/institutions/men/.  At present, there are zero inmates who are reported positive, or who are isolated while they are treated/recover. There are also 31 current inmates who previously tested positive

and have recovered. There has not been a COVID-related death at this institution. The latest statistics are available at www.bop.gov/coronavirus.

### D.    Vaccinations

BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation to ensure BOP receives the COVID-19 vaccine as it becomes available. As of the week of February 8, 2021, vaccine doses had been delivered to every BOP institution.

At Mendota, where the defendant is held, BOP has fully vaccinated 178 staff members, and 370 inmates (approximately 42% of the current inmate population and does not account for those additional inmates who declined vaccination). For the latest statistics, see www.bop.gov/coronavirus. As previously noted, on April 7, 2021, the defendant was offered the Moderna COVID-19 vaccine, and he refused it. Exhibit Eight (2021 medical records, p. 38).

## II.    Discussion

### A.    Governing Law

Assuming a defendant has satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A), resolving the merits of a compassionate-release motion involves a "three-step inquiry": a district court must (1) "find that extraordinary and compelling reasons warrant a sentence reduction," (2) "ensure that such a reduction is consistent with applicable policy statements

7

issued by the Sentencing Commission," and (3) "consider all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." *United States v. Elias*, 984 F.3d 516, 518 (6th Cir. 2021); 18 U.S.C. § 3582(c)(1)(A). "[D]istrict courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others." *Elias*, 984 F.3d at 519. In *Elias*, the Sixth Circuit held that USSG § 1B1.13 is not an "applicable" policy statement for defendant-initiated motions for compassionate release. *Id.* Although the Sixth Circuit has concluded that this policy statement is not currently binding in connection with motions filed by defendants, the courts of appeals have recognized that it continues to provide important "guideposts." *United States v. McGee*, -- F.3d --, 2021 WL 1168980, at *10 (10th Cir. Mar. 29, 2021); *see United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.").

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.).  As the terminology in the

statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted). That statutory requirement means that a defendant's reasons for release must satisfy two strict criteria. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant's reasons must be "extraordinary"—meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). The reasons must also be "compelling"—meaning "so great that irreparable harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3. A defendant must establish both criteria to satisfy the statute's eligibility threshold. Viramontes has satisfied neither.

## B.   COVID-19 and Compassionate Release

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit therefore held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's

9

spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) (not precedential) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."); *see also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) (Van Bokkelen, J.) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

The CDC's list of risk factors was most recently updated on March 29, 2021. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that "can make you more likely to get severely ill from COVID-19." An inmate who has not been offered a vaccine, who presents a condition on that list, presents an "extraordinary and compelling reason" allowing consideration of compassionate release.

## C.    The Defendant's Circumstances

Here, the defendant presents the risk factors of obesity, hypertension, and asthma. However, he no longer presents an "extraordinary and compelling reason" because he has declined a vaccination.

10

On April 7, 2021, the defendant was offered the Moderna COVID-19 vaccine, and he refused it. He has no known medical contraindication for the vaccine. His motion for compassionate release should be denied for this reason.

The government during the pandemic has acknowledged that an unvaccinated inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an extraordinary and compelling circumstance under that provision.

That circumstance now does not exist in this case. The defendant has been offered a vaccine approved by the FDA for emergency use based on its conclusion that, in extensive testing, the vaccine was approximately 95% effective in preventing COVID-19 infection, including in participants with medical comorbidities associated with high risk of severe COVID-19. *See* FDA Decision Memorandum, Moderna - Dec. 18, 2020,

https://www.fda.gov/media/144673/download.

Various studies continue to confirm the efficacy of the vaccines. For instance, on April 1, 2021, Pfizer reported its follow-up study on the 44,000 participants in its Phase 3 trial. It found that the vaccine, based on mRNA technology (like the Moderna vaccine), was 91.3% effective against COVID-19, measured seven days through up to six months after the second dose, across age,

gender, race, and ethnicity demographics, across participants with a variety of underlying conditions, and during a period through March 13, 2021, when variants were circulating. Pfizer further found that the vaccine was 100% effective against severe disease as defined by the CDC and 95.3% effective against severe disease as defined by the FDA.

https://www.businesswire.com/news/home/20210401005365/en/.

The CDC likewise recently reported the effectiveness of the Pfizer and Moderna vaccines in preventing infection during the same period and concluded that its extensive data "reinforce CDC's recommendation of full 2-dose immunization with mRNA vaccines. COVID-19 vaccination is recommended for all eligible persons . . . ." "Interim Estimates of Vaccine Effectiveness," https://www.cdc.gov/mmwr/volumes/70/wr/mm7013e3.htm (Mar. 29, 2021).

Thus, the defendant, notwithstanding the risk factors he presents, does not present any extraordinary and compelling reason allowing compassionate release. He has elected to decline the vaccine, forgoing the opportunity for "self-care" that BOP made available. For this reason, the motion should be denied. *See, e.g.*, *United States v. Baeza-Vargas*, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021) (Teilborg, J.) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances.") (citing more

than a dozen cases); *United States v. Greenlaw*, 2021 WL 1277958, at \*7 (D. Me. Apr. 6, 2021) (Woodcock, J.) (the court reviews CDC guidance and numerous other decisions and concludes, "The risk-benefit analysis in favor of inoculation is so overwhelming that the Court holds Mr. Greenlaw's refusal to be vaccinated against his motion for compassionate release."); *United States v. Jackson*, 2021 WL 1145903 (E.D. Pa. Mar. 25, 2021) (court denied relief even though the defendant was 58 years old and suffered from, among other conditions, obesity (BMI of 31.2), type II diabetes, hypothyroidism, hypertension, asthma, and high cholesterol, explaining that since Jackson refused the vaccine, she "voluntarily declined to 'provide self-care' and mitigate her risk of a severe COVID-19 infection", further noting that "[t]he FDA approved the Moderna vaccine for use after extensive testing, concluding that it is 95% effective in preventing infection and virtually entirely effective in preventing severe disease"); *United States v. Austin*, 2021 WL 1137987, \*2 (E.D. Mich. Mar. 25, 2021) (Cleland, J.); *see also, e.g.*, *United States v. Jackson*, 2021 WL 806366, at \*1-2 (D. Minn. Mar. 3, 2021) (Magnuson, J.) ("Jackson's decision to refuse the vaccine flies in the face of any medical recommendation regarding the vaccines. While he is within his rights to refuse any treatment he wishes to forego, he cannot simultaneously claim that he must be released because of the risk of complications while refusing a vaccine that could virtually eliminate that risk."); *United States v. Williams*, 2021 WL 321904

(D. Ariz. Feb. 1, 2021) (Rayes, J.) (defendant's explanation for refusal was "incredible in light of his claim that his risk of a serious illness from the COVID-19 virus is an extraordinary and compelling reason for his immediate release"); *United States v. Gonzalez Zambrano*, 2021 WL 248592 (N.D. Iowa Jan. 25, 2021) (Williams, J.) (denied based on 3553(a) factors, but states: "It would be paradoxical to endorse a system whereby a defendant could [proffer] extraordinary and compelling circumstances for compassionate release" by refusing "health care [offered] to them"); *United States v. Lohmeier*, 2021 WL 365773, at *2 (N.D. Ill. Feb. 3, 2021) (Tharp, J.) ("In declining vaccination (twice), Mr. Lohmeier declined the opportunity to reduce his risk exposure to COVID-19 dramatically; he cannot reasonably expect that prolonging his risk by declining vaccination will be rewarded with a sentence reduction.").

Nearly all courts agree with these views. *See, e.g.*, *United States v. Martinez*, 2021 WL 718208, at *2 (D. Ariz. Feb. 24, 2021) (Logan, J.); *United States v. Figueroa*, 2021 WL 1122590, at *5 (E.D. Cal. Mar. 24, 2021) (Mueller, C.J.) ("If defendants could buttress their motions for compassionate release by refusing a safe and effective vaccine, they would be operating on an unfairly perverse incentive."); *United States v. Piles*, 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (Bates, J.); *United States v. Reynoso*, 2021 WL 950081, at *2 (D. Mass. Mar. 12, 2021) (Gorton, J.) ("[T]he sincerity of his concern for his health is

14

dubious given that he rejected the opportunity to receive the COVID-19 vaccine");
*United States v. Toney*, 2021 WL 1175410, at *1 (E.D. Mich. Mar. 29, 2021)
(Levy, J.); *United States v. King*, 2021 WL 736422, at *2 (S.D.N.Y. Feb. 24, 2021)
(Seibel, J.); *United States v. Mascuzzio*, 2021 WL 794504, at *3 (S.D.N.Y. Mar. 2,
2021) (Keenan, J.); *United States v. McBride*, 2021 WL 354129, at *3 (W.D.N.C.
Feb. 2, 2021) (Bell, J.); *United States v. French*, 2021 WL 1316706, at *6 (M.D.
Tenn. Apr. 8, 2021) (Richardson, J.) (relief denied in part based on refusal of
vaccine); *United States v. Pruitt*, 2021 WL 1222155, at *3 (N.D. Tex. Apr. 1,
2021) (Boyle, J.).

Defendant may[2] contest this consensus, pointing out that the vaccines may
not be 100% effective, that they were not tested in a congregate setting, that they
may not be effective for all individuals, that variants may emerge that bypass the
vaccines, and that the vaccines may cause side effects. These courts and others
have almost uniformly rejected these arguments. One explained:

> Given that Rodriguez is or will soon be fully vaccinated against COVID-
> 19, the Court concludes that Rodriguez's obesity and hypertension are not
> extraordinary and compelling reasons justifying his release. . . . Rodriguez
> argues that it is unclear how effective the Pfizer vaccine is, how long its
> effects will last, and whether it protects against the COVID variants, leaving
> a risk that he could still become seriously ill. Although all evidence to date is
> that the Pfizer vaccine is very effective, no one claims that it is 100 percent
> effective, and thus there remains a small risk that Rodriguez could be
> infected by COVID-19 and become seriously ill from that infection. But

---

[2] Even though the defendant filed this motion (April 18, 2021) after refusing the
Moderna vaccine (April 7, 2021), he does not discuss vaccinations in his motion.

> every prisoner runs a small risk of lots of serious medical conditions
> (including COVID-19). The small risk that Rodriguez may contract COVID-
> 19 and become seriously ill is simply too speculative to justify his release.

*United States v. Rodriguez*, 2021 WL 1187149, at *1-2 (D. Minn. Mar. 30, 2021) (Schiltz, J.). Accordingly, the prevailing view is that "absent some shift in the scientific consensus, vaccination against COVID-19 would preclude the argument that a defendant's susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)." *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) (Ludington, J.); *see also, e.g.*, *United States v. White*, 2021 WL 964050, at *2 (E.D. Mich. Mar. 15, 2021) (Levy, J.) (denied after first dose, and rejects speculation regarding future effectiveness against variants: "Defendant is free to renew his motion should more information emerge suggesting that the Pfizer vaccine cannot protect him from new imminent strains of COVID-19. However, at this time, the Court does not find extraordinary and compelling circumstances based on that speculation."); *United States v. Kariblghossian*, 2021 WL 1200181, at *3 (C.D. Cal. Mar. 29, 2021) (Snyder, J.) ("Nonetheless, at this time, the available scientific evidence suggests that the Pfizer vaccine is highly effective against known variants of the SARS-COV-2 virus that causes COVID-19) (citing CDC studies and Yang Liu, et. al., Neutralizing Activity of BNT162b2-Elicited Serum, The New England Journal of Medicine (March 8, 2021),

16

https://www.nejm.org/doi/full/10.1056/NEJMc2102017?query=featured_home));

*United States v. Goston*, 2021 WL 872215, at *3 (E.D. Mich. Mar. 9, 2021) (Levy,

J.) (finding the potential that the Pfizer vaccine does not protect against variants

inadequate to justify release); *United States v. Brown*, 2021 WL 1154207, at *3

(S.D.N.Y. Mar. 26, 2021) (Wood, J.) (speculation about variants is insufficient);

*United States v. Del Rosario Martinez*, 2021 WL 956158, at *3 n.10 (S.D. Cal.

Mar. 10, 2021) (Anello, J.) (declining to rely on a frequently submitted declaration

of Dr. Tara Vijayan, stating, "with all due respect to Dr. Vijayan's expertise and

experience, the Court declines to contribute in any fashion to public skepticism

regarding the safety and efficacy of the available COVID-19 vaccines or to

second-guess the Food and Drug Administration's findings and decision to issue

Emergency Use Authorizations for COVID-19 vaccines 'for which there is

adequate manufacturing information to ensure its quality and consistency.' The

Path for a COVID-19 Vaccine from Research to Emergency Use Authorization,

available at www.FDA.gov/COVID19vaccines#FDAVaccineFacts (last visited

3/9/2021)."); *United States v. Greenlaw*, 2021 WL 1277958, at *7 (D. Me. Apr. 6,

2021) (Woodcock, J.) ("The potential side effects from the vaccination are trivial

in comparison to the severe illness, including death, Mr. Greenlaw may endure if

he contracts the virus. Moreover, the same CDC that Mr. Greenlaw cites [listing

possible side effects of the vaccine] unequivocally recommends that people get vaccinated").

It is possible that the scientific consensus may shift dramatically if vaccine-resistant variants emerge or the vaccines prove less efficacious than studies to date suggest. If those possibilities materialize, nothing would prevent the defendant from filing another motion for compassionate release. *United States v. Singh*, 2021 WL 928740, at *3-4 (M.D. Pa. Mar. 11, 2021) (Brann, J.) ("Indeed, the majority of CDC recommendations for fully vaccinated people indicate that the CDC's primary concern is not with fully vaccinated individuals being hospitalized due to COVID-19, but with such individuals potentially spreading the virus to unvaccinated individuals. . . . It is, of course, possible that future research will demonstrate that current, or future, COVID-19 variants mitigate the effectiveness of the Moderna vaccine to such an extent that the vaccine no longer provides individuals with effective protection. However, Singh has not demonstrated that such is the case today and, it bears emphasizing, the burden falls upon Singh to demonstrate that compassionate release is warranted.").

At this time, this Court's assessment should be driven by the prevailing scientific view that vaccination makes extremely rare, and possibly eliminates entirely, the risk of severe disease from the virus.

The result therefore will not be different if the defendant changes his mind and takes the vaccine, as all public health officials advise, as that action would also preclude compassionate release grounded on COVID-19. *See, e.g.*, *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) (Ludington, J.) ("absent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)."). Absent a dramatic change in the current scientific assessment regarding the efficacy of the vaccines, the advent of widespread vaccine availability should bring to an end this unprecedented period in which compassionate release has been available based on the threat of the virus. Instead, sentence reductions based on medical conditions once again should be limited to extraordinary conditions that are terminal or severely limit an inmate's ability to function in a correctional setting. *See, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (relief is "rare" and "extraordinary"); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (Failla, J.) ("a defendant's medical condition must be one of substantial severity and irremediability"); *United States v. Polnitz*, 2020 WL 1139836, at *2 (E.D. Wis. Mar. 9, 2020) (Pepper, J.) (must be extraordinary; "Many inmates suffer from pain and mental illness."). At present, the defendant does not present any such condition. For all of these reasons, compassionate release is not warranted here.

19

### D.    3553(a) Factors

Further, even if the Court determined that defendant was at an elevated medical risk, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate before relief can be granted. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same).

This Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction". *United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021). The defendant must therefore "make a compelling case as to why the sentencing court's § 3553(a) analysis would be different if conducted today." *Id.* Here, even if the Court were to find that Viramontes established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

For starters, Viramontes's long remaining sentence weighs heavily against release. The Sixth Circuit has repeatedly upheld the denial of compassionate

20

release under § 3553(a) when a defendant has a long remaining sentence, including in a recent published decision. *Ruffin*, 978 F.3d at 1008; *accord Kincaid*, 802 F. App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant] raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008. With a statutory release date projected for June 2, 2030, Viramontes still has over nine years remaining on his sentence.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with many years left on his sentence, like Viramontes, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id.*

21

### 3553(a)(1): The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Jorge Viramontes actively participated in a multi-kilogram conspiracy to deal in cocaine. Given the quantity of cash ($619,230.00) law enforcement found during the search, it appears that his family home was the primary gathering point for the work of the conspiracy. The reasonable inference is that he was a highly trusted and important member of the conspiracy. His federal criminal conduct took place when the defendant was 42 – an age where he was clearly old enough to know better – and when he was suffering from some of the same conditions (e.g., asthma, obesity) he presents today.

And, as the Court knows, this was not his first time engaging in narcotics distribution. For 17 straight years (except when he was incarcerated) from the ages of 25-42 (his age at the time of the instant drug offense), Viramontes was consistently committing crimes and dealing in drugs. PSR, ¶¶ 32-49. His crimes, including the instant offense, occurred in three separate states (California, Arizona, and Michigan), demonstrating his criminal conduct was not limited by geographic boundaries. His five drug offenses (four prior convictions and the instant offense) involved a wide variety of drugs (methamphetamine, amphetamine, marijuana, cocaine, and cocaine base) – presumably, he chose to deal in whatever drug was most lucrative to him at the time. His criminal history reflects he can't stay away from crime. For example, his "supervision end date" for his 1995 drug conviction

was January 28, 2004. *Id.* at ¶ 37. Two months later, he was again arrested on a drug case. *Id.* at ¶ 43. Additionally, Viramontes committed the instant federal offense while on probation and his criminal history reflects he did the same in the past. *Id.* at ¶¶ 35-37. A seasoned drug trafficker, Viramontes chose repeatedly to deal in drugs, with full awareness of the danger and risk involved.

His presentence report reflects that Viramontes had a stable background, some level of education (into the 10th grade), no mental or emotional problems, no substance abuse issues, and that he was skilled as a painter. *Id.* at ¶¶ 50-57.  All of this demonstrates that he had both the skills and the capacity to make better choices. Despite these fine qualities, Viramontes has chosen a path for nearly his entire adult life that wholly conflicts with his potential for doing good. And, while he should be commended for the courses he has taken while incarcerated, his past history reflects an inability to use that learning to do good.

### 3553(a)(2)(A), (B) & (C): The Need for the Sentence to Reflect the Seriousness of the Offense, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public from Further Crimes of the Defendant

As stated above, Defendant engaged in serious criminal misconduct and he played a substantial role in this dangerous drug trafficking organization. He was certainly mature enough in age (42 at the time of the offense) to know better than to continue selling drugs after four prior drug convictions and a firearms offense. As the Court knows, when law enforcement searched his home, finding the

23

$619,230 in cash, his family was present with him. PSR, ¶ 14. Such conduct recklessly endangered his family.

Despite multiple opportunities to act otherwise, Viramontes has shown that he does not respect the law. The government believes that completing his sentence of incarceration is necessary to reflect the seriousness of, and provide just punishment for, this narcotics offense.  It is also necessary to protect the public from more drug trafficking. While the government acknowledges the BOP has designated Viramontes as a "Low Risk Recidivism Level," his track record strongly suggests he will return to selling drugs.

Viramontes has shown that felony convictions, probation sentences, and prison sentences do not deter him. He has a history of ignoring the directives of the courts. Judge Gadola's sentence was appropriate to specifically deter Viramontes from selling any more drugs. And, from a general deterrence perspective, Judge Gadola's sentence sent the clear message that career offenders who sell drugs will be treated accordingly.

The defendant fails to demonstrate how release, 170 months into a 327-month sentence for a serious drug crime, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). Courts have generally denied release in circumstances comparable to those presented here, even before the advent of widespread

24

vaccination. *See, e.g.*, *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020) (defendant has served 10 years of 25-year term for drug and witness tampering offenses; suffers from a blood disorder that caused strokes and partial paralysis, as well as "heart problems, high blood pressure, high cholesterol, and blood clots"; the district court did not abuse its discretion in denying relief, based on the fact that the defendant had not served half his sentence, the original sentence included a 5-year downward variance, he committed serious offenses while suffering from the same conditions, and he had a record of drug and weapons offenses); *United States v. Mathison*, 2020 WL 3263042 (N.D. Iowa June 17, 2020) (Elkton inmate has significant risk factors, but has served only 164 months of 372-month sentence for leading drug organization; thus, "the § 3553(a) factors do not come close to supporting his release at this time, having served less than half of his lengthy sentence."); *United States v. Mathews*, 2020 WL 3498100, at *2 (E.D. Mich. June 29, 2020) ("Drug-related offenses are serious and Defendant has only served 40% of his 151-month sentence."); *United States v. Goode*, 2020 WL 6445930, at *6 (E.D. Pa. Nov. 2, 2020) (Kenney, J.) (notwithstanding health conditions, release is not warranted with 55 months remaining on 210-month sentence for career offender who committed drug trafficking offenses); *United States v. Hall*, 2020 WL 6822948 (E.D. Pa. Nov. 19, 2020) (Bartle, J.) (the defendant's medical conditions do not justify release; in addition, release after 170

25

months of a 280-month sentence is inappropriate because he was a career offender who committed an offense involving three kilograms of cocaine possessed near a school); *United States v. Whitner*, 2020 WL 4431570, at *3 (W.D. Pa. July 31, 2020) (the defendant is at risk due to diabetes and obesity, but he committed a serious drug trafficking offense, had a prior conviction for drug trafficking, has an extensive criminal history, and continued to engage in criminal activity while on bond; also, he avoided a much greater sentence based on prior felony drug convictions by entering into a plea agreement; in these circumstances, reduction of a 19½-year term after 13 years is not appropriate).

### 3553(a)(6): The Need to Avoid Unwarranted Sentence Disparity

In his motion, Viramontes asserts that 18 U.S.C. 3553(a)(6), the need to avoid unwarranted sentencing disparities, "may be the most pertinent" of all the 3553 factors. ECF No. 56, PgID.225. The basis of the argument stems from the fact that Viramontes and his co-defendant, Deshawn Howard, received different sentences and Howard received subsequent reductions in his sentence that Viramontes did not. Several reasons exist justifying – both factually and legally – Howard's lower original sentence and subsequent reductions in his sentence. In the end, any disparity is not "unwarranted."

The defendants did not have similar records. Viramontes had five convictions (not including the instant federal conviction) between the ages of 25-

39. Howard, in contrast, had two convictions (not including the instant federal conviction) when he was 17 and 18. It is essential to recognize that due to Viramontes's more extensive and long-lasting criminal history, he was categorized as a "career offender," but Howard was not.

Moreover, the government asserts that while both defendants were engaged in drug dealing, it appears from the facts in the presentence report that Viramontes was the more trusted, and arguably more important, member of the conspiracy. He controlled huge quantities of cash at his home – the same home that also appeared to be the focal point of the operation. While Viramontes points out that his co-defendant fled from the police, a fact Judge Gadola knew about at sentencing, Viramontes fails to point out that he recklessly pursued this dangerous cocaine conspiracy from the same building that housed his family.

Lastly, the government submits that Viramontes, for appropriate reasons, does not know all the details surrounding the sentence and subsequent reductions in Howard's sentence. As was noted above, due to Viramontes's cooperation as reflected in his plea agreement, the government filed an Amended Penalty Enhancement Information. ECF No. 20, PgID.69, 70-72 (plea agreement); ECF No. 21, PgID.88 (Amended Penalty Enhancement Information). In other words, in exchange for his cooperation, the government agreed to reduce his sentence from mandatory life to mandatory minimum of twenty years in prison. While Howard's

plea agreement was sealed – and is therefore not a public document – the public record does reflect he received a similar benefit as the government filed a similar Amended Penalty Enhancement Information for him. ECF No. 24, PgID.95.

The publicly available facts further suggest that Howard cooperated more extensively than Viramontes, thus entitling him to a greater reduction in his sentence. Judge Gadola sentenced Viramontes to 327 months in prison, the top of his agreed-upon guideline range. ECF No. 29, PgID.102. In contrast, due to the statutory minimum of 240 months, Howard's guideline range was 240 months. Judge Gadola ultimately sentenced Howard to 188 months in prison. ECF No. 35, PgID.142. No plea agreement was available in the public record to help explain this sentence. In 2015, however, in a publicly filed Stipulation Regarding Sentence Reduction, the government and Howard's counsel stated: "On October 10, 2008, after a motion by the government under 18 U.S.C. § 3553(e) and USSG § 5k1.1, Defendant Deshawn Howard was sentenced by this Court to 188 months in custody, based on his conviction for conspiracy to possess with intent to distribute five kilograms or more of cocaine." ECF No. 39, PageID.156. The reference to 5K1.1 clearly gives this Court more information about why Howard's sentence was not 240 months in prison. No 5K1.1 motion was filed on behalf of Viramontes.

The Stipulation Regarding Sentence Reduction regarding Howard also explains why Howard's sentence was further reduced to 118 months in prison by this Court. ECF No. 45, PageID.187 (Amended Judgment). As Howard was not a career offender, he was entitled to a retroactive amendment to his sentencing guideline range, entitling him to "a sentence as low as 118 months." ECF No. 39, PageID.157.

In contrast, as a career offender, Viramontes was not entitled to such a reduction. The defendant neither denies that he is a career offender, nor does he argue that he is somehow now entitled to a reduction under 18 U.S.C. 3582(c)(2). This Court recognized the critical difference between Howard and Viramontes in denying Viramontes's motion requesting appointment of counsel (where he asserted entitlement to a reduction of sentence pursuant to 18 U.S.C. 3582(c)(2), due to Amendment 782 of the Sentencing Guidelines). ECF No. 36, PageID.149 (motion requesting appointment of counsel). In its August 10, 2016, Order, this Court stated: "The defendant is not eligible for a reduction of sentence. The Court imposed a sentence of 327 months custody on February 25, 2008. The defendant is identified as a Career Offender at the time of sentencing and, as such, he is not eligible for a reduction of sentence." ECF No. 46, PageID.192 (Order Regarding Motion for Sentence Reduction Pursuant to 18 U.S.C. 3582(c)(2)).

In sum, any disparity between these two defendants is not "unwarranted."

29

**III.     Conclusion**

At present, all these considerations counsel strongly against relief. Upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully submitted,

SAIMA S. MOHSIN
Acting United States Attorney

*s/Patrick E. Corbett*
PATRICK E. CORBETT
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
313-226-9703

Dated: May 13, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all interested parties.

*s/Patrick E. Corbett*
Patrick E. Corbett P41182
Assistant U.S. Attorney
211 W. Fort Street
Suite 2001
Detroit, Michigan 48226